IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FRANK ROHR,
        Plaintiff,

    vs.                                    No. 19-1114-JTM

UNION PACIFIC RAILROAD CO.,
        Defendants.


MEMORANDUM AND ORDER


Plaintiff Frank Rohr brings the present Americans with Disabilities Act claim against his former employer, the Union Pacific Railroad. The railroad terminated Rohr's employment after he two leaves of absence in 2016 and 2017, in which he dealt with a major depressive disorder, as well as repeated panic attacks, chronic ideations of homicide and suicide, and addiction to pain killer medications. For the reasons provided herein, the court hereby grants defendant's motion for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.

*McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court excludes any requested findings of fact premised on evidence which is purely conclusory, not grounded on personal knowledge or

otherwise inconsistent with the Rules of Evidence, the Pretrial Order, or required disclosure under Fed.R.Civ.Pr. 26.

**Findings of Fact**

Union Pacific Railroad Company is an interstate Class I freight railroad linking 23 states in the western two-thirds of the U.S. by rail. The company is headquartered in Omaha, Nebraska and employs more than 35,000 employees.

Rohr previously worked for Union Pacific as an Assistant Signalperson in 2007. On November 11, 2010, Union Pacific rehired him as Thru Freight Brakeman. In October 2015, Rohr became a Conductor, which is a safety-sensitive position, in Fort Worth, Texas.

It is uncontroverted Rohr has a long history of alcohol and substance abuse. He started drinking alcohol and using drugs such as marijuana as a teenager. He progressed to other illicit drugs such as cocaine, meth, mushrooms and LSD. Rohr contends in response that he has stopped drinking, and that he has not used drugs while working for Union Pacific. He does acknowledge in his deposition that he possibly used marijuana recreationally while employed by the railroad.

It is uncontroverted that Rohr has also suffered from mental health issues such as depression, anxiety and experiencing suicidal ideations since he was 12 years old. While

Rohr concedes he has had these mental health issues since childhood, he has also enjoyed long periods of stability. He also states that, while he has had ideations of suicide, this had never progressed to planning.

Rohr has used alcohol and drugs to self-medicate. He often drank at least 12 to 18 beers each night. Rohr was forced to stop drinking because of his bouts with chronic and severe pancreatitis. His medical records note that his liver enzymes were dangerously high.

In February 2016, Rohr experienced his third episode of pancreatitis. During his hospitalization, it was also discovered that Rohr needed to have his gallbladder removed. To manage his pain after surgery, Rohr was prescribed Tramadol, a long-acting, opiate medication.

Tramadol is a restricted prescription according to Union Pacific's list of Restricted Prescription Drugs. Because Rohr was taking Tramadol in early 2016, he was familiar with the list of Union Pacific's Restricted Prescription Drugs and the Company's policy regarding prescription drug use.

**Railroads and Opioids**

In August 2014 in Arden, Nevada, a Union Pacific train collided with a building, derailing one of the cars, when the Locomotive Engineer failed to stop the train before it ran through the end-of-track bumping post. The National Transportation Safety Board

(NTSB) investigated the accident and reported that the Locomotive Engineer had been prescribed high-dose opioid medication, either oxycodone or hydrocodone.

In its report, NTSB recognized that opioids can impair the mental or physical ability required to perform potentially hazardous tasks, like driving and operating heavy machinery; that chronic, daily opioid use is generally disqualifying for commercial airline pilots, mariners, and drivers; and NTSB recommended that Union Pacific assess the safety of all medications being used by employees in safety-sensitive positions each time an employee undergoes a medical evaluation. NTSB also recognized that Federal Railroad Administration (FRA) medical standards were insufficient to protect the rail industry from safety hazards created by certain medications and recommended that FRA identify a list of medications whose use disqualifies employees from safety-sensitive positions because of the medications' potential for negatively affecting rail safety.

In November 2015, Union Pacific published a list of Restricted Prescription Drugs for workers in safety critical positions. Union Pacific created the list in consultation with Dr. James Diaz, a board-certified physician in Medical Toxicology and Professor and Program Director in Environmental and Occupational Health Sciences at the School of Public Health at Louisiana State University. The list of Restricted Prescription Drugs applies to employees in safety critical positions, including Locomotive Engineers and Conductors. Under the list, workers in safety critical positions are prohibited from taking long-acting opioids or benzodiazepines, and such

5

workers taking short-acting opioids are prohibited from working until at least 12 hours after their last dose.

Under the Restricted Prescription Drugs list, if an employee is prescribed a restricted drug, they were instructed to contact their physician to discuss the prescription, their safety-related duties, a plan to discontinue the restricted drug and safer alternatives as recommended by their physician.

Union Pacific's Drug and Alcohol policy and federal law also prohibit illegal drug use at all times. This prohibition also applies to prescribed controlled substances unless several conditions are met, including that the substance is being used at the prescribed dosage.

In June 2016, Rohr started taking Norco, a short-acting opiate, to manage the pain caused by his chronic pancreatitis. Norco is a brand name for Hydrocodone and was on Union Pacific's list of Restricted Prescription Drugs. Rohr should have discussed safer alternatives with his physician and a plan to discontinue use. Rohr also had to ensure that he did not work until 12 hours after his last dose. However, Rohr did not discuss the Norco prescription with his physician, nor did he ask for an alternative. Rohr could not recall how often he took Norco to manage his pain, or if he complied with Union Pacific's 12-hour rule.

**2016 Leave of Absence**

On June 29, 2016, Rohr was working on a train as a Conductor when it struck and killed a trespasser that was on the tracks. Rohr was responsible for notifying law enforcement. Witnessing the accident was traumatic for Rohr as it was the second time during his employment with Union Pacific that he had been working on a train that hit a trespasser.

After witnessing the incident, Rohr took time off work and contacted Union Pacific's Employee Assistance Program (EAP) for treatment to deal with anxiety, depression and suicidal ideations. Specifically, Rohr sought help because he had a "desire to be dead" after witnessing the incident. Rohr doesn't know the extent to which the June 29, 2016 incident has affected his mental health.

On October 3, 2016, Rohr contacted EAP again and disclosed he did not trust himself to operate his train because he was having panic attacks. Rohr was concerned about his safety as well as the safety of his coworkers and the public.

When having a panic attack on a train, Rohr would second-guess himself, question whether he was on the correct route, and forget communications he had with the dispatcher. Rohr also had "the tremendous desire to get the hell out of there…like fight or flight," when the train was traveling at 60 miles per hour. Rohr experienced these panic attacks at least three to four times before he contacted EAP.

After calling EAP on October 3, 2016, Union Pacific placed Rohr on a medical leave of absence, effective that day.

On October 26, 2016, Rohr had his first appointment for therapy with Gail Unruh-Revel, LSCSW, at Prairie View Hospital in Wichita, Kansas. During his initial assessment, Rohr reported that his job with Union Pacific was hard on his family and had caused him to start drinking again in 2014.[1] When he resumed drinking, he initially started with three beers a night, but he soon began drinking more heavily and was drinking up to 12-18 beers a night. He was depressed, felt hopeless and had thought about hurting himself. He believed "he'd be better off dead." Because of depression and anxiety, he had very little energy, and it was hard to "concentrate on things nearly every day." He was easily annoyed, irritable and was "afraid that something awful might happen." He was also experiencing blind rage, in which he would become so angry that he couldn't move or speak. Rohr described his anger as catatonic.

During this appointment, Rohr admitted that he had used many different drugs before he started working at Union Pacific. Unruh-Revel noted that he seemed "a bit guarded as to any current use." She also wrote Rohr appeared to be anxious and depressed. She diagnosed him with recurrent, moderate major depressive disorder and generalized anxiety disorder. She recommended that Rohr participate in individual psychotherapy and have his medications reviewed by a psychiatrist.

---

[1] In his Response, the plaintiff contends that his psychiatric conditions are not caused by "his job, in and of itself," but also stemmed from observing two suicides and from living with his in-laws. But it appears that Rohr observed the traumatic incidents while working for Union Pacific, integrally linking the trauma to his employment.

On November 7, 2016, Rohr had his first appointment with Dr. Diana Ketterman, a general practitioner, at the Wheatland Clinic in Wichita, Kansas. Dr. Ketterman wrote Rohr a prescription for Norco 325 mg-10mg #75 to help him manage his chronic pain caused by pancreatitis.

From November 18, 2016 to December 1, 2016, Rohr voluntarily participated in an intensive, outpatient program at Prairie View Hospital, also known as a partial hospitalization. Rohr attended group therapy, art therapy, recreational programming, medication management sessions, and received other mental health services.

Rohr's discharge summary documented that Rohr had experienced suicidal ideation with some planning and that he became obsessed with death after losing a loved one. He had flashes of using a gun to end his life. Rohr had no history of suicide attempts, but his older sister had made an attempt. The discharge summary described Rohr's anxiety as including cardiac issues such as palpitations, varying pulse rates, right arm pain and shortness of breath. His anxiety usually "came on suddenly" and was "triggered by events." The discharge summary described his depression as debilitating and prevented him from sleeping and even moving at times.

The discharge summary also documented Rohr's drug and alcohol use. Rohr denied any current use of alcohol, but admitted to using "cannabis in the past month and every time he went to Colorado." He also admitted to using "heavier drugs" such as cocaine meth, mushrooms, and LSD between the ages of 17 and 25. Rohr shared that marijuana had always been his drug of choice.

The discharge summary included diagnoses for moderate and recurrent major depressive disorder, generalized anxiety disorder and panic disorder. To receive a diagnosis for major depressive disorder, Rohr must have had multiple depressive episodes in the past and was at risk for developing future depressive episodes, even with psychiatric treatment.

On November 30, 2016, Rohr asked to extend his medical leave of absence by 60 days. Union Pacific approved the request three days later.

During Rohr's medical leave of absence, Rohr sought psychiatric care from Dr. Salinder Mahal, a psychiatrist, outpatient therapy from Unruh-Revel, and pain management from Dr. Ketterman.

Rohr continued to take two Norco a day to manage the pain caused by his chronic pancreatitis as well as BuSpar to manage his anxiety. Norco is a restricted drug according to Union Pacific's Restricted Prescription Drugs list.

Moreover, Rohr complained to Dr. Mahal that BuSpar caused him to feel sedated. Dr. Mahal, did not review notes relating to Rohr's individual therapy sessions because therapy notes were considered more private than medication management notes. Therefore, Dr. Mahal relied on Rohr to provide an accurate picture of his condition separate from what he disclosed to his therapist, Unruh-Revel.


**Rohr returns to work, 2016-17**

On January 13, 2017, Rohr received approval to return to work as a Conductor without restriction. But despite being cleared to return to work after a three-month leave of absence, Rohr was still experiencing anxiety and having panic attacks. Due to a lack of sleep, Rohr was also having issues concentrating at work.

On January 25, 2017, Rohr went to the emergency room at Wesley Medical Center in Wichita, Kansas complaining of abdominal pain, despite having already taken at least two doses of Norco to manage his pain. The emergency room physician wrote Rohr a prescription for Norco #10, but the prescription was cancelled because the pharmacist notified the emergency room physician that Rohr had just filled a 30-day, 120 tablet supply of Norco.

On February 1, 2017, Rohr was transferred to a Locomotive Engineer position in Sweetwater, Texas.

The essential job functions of a Locomotive Engineer include operating locomotive units by using engine switches, valves and circuit breakers in proper sequence; controlling train speed; inspecting locomotives; learning, recalling and applying information and operating procedures; identifying operational problems and formulating corrective actions; observing and monitoring conditions of trains and railroad right of ways; communicating train data and information; interpreting and transmitting signals; and assuring compliance with Union Pacific, Federal, and industry rules, general orders and instructions. Engineers are also required to lift at least 25 pounds as they carried supplies for their locomotives such as large buckets of ice and

11

knuckles. Sometimes Engineers help with the movement of weights of up to 90 pounds. Engineers are required to travel and work long, nonstandard hours. Rohr often worked nights, holidays and weekends.

Rohr was a safety-sensitive employee. Performing his job in a manner assuring the safety and health of himself, his co-workers, and the public is critical, as well as following Company and Federal safety and health rules, practices, and procedures. Engineers operate trains, conduct inspections, observe and monitor conditions of trains and railroad right of ways, communicate train data and information, and interpret and transmit signals. They must be aware of their surroundings at all times, fully concentrating and focused on what they are doing. Operating a train impacts rail travel, not only for Union Pacific but also for the general public. People's lives are at stake and Engineers need to have their heads in the game at all times. Mistakes can be costly and deadly. The ability to take appropriate action when conditions threaten safety and health of the employee, their co-workers, or the public is essential. Good concentration, focus, alertness, insight, judgment, and impulse control are all important in this regard.

Rohr often worked 12-hour days, six out of every eight days. The travel requirements for his job took a toll on Rohr and caused him to experience severe depression and anxiety.

While working in his safety-sensitive position, Rohr was still being prescribed a 30-day, 120 tablet supply of Norco. He testified that he was taking three to four tablets a day. He also testified that he would often take more than the prescribed dosage.

On March 22, 2017, Rohr had an appointment with Dr. Mueeza Zafar, a general practitioner, at the Wheatland Clinic. Dr. Zafar noted that Rohr was still taking BuSpar to manage his anxiety. Dr. Zafar also warned Rohr that he shouldn't be using opiate medication on a regular basis, especially at his age.

Rohr testified that at this point in 2017, he was addicted to opioids.

On April 10, 2017, Rohr had a medication check-in with Dr. Mahal where he reported that things were "not so well," and that he was having a difficult time transitioning back to work. He was struggling to manage his medications with his work schedule. Specifically, Rohr was confused about when to take his medications because his work schedule varied. Rohr also reported that he had experienced several panic attacks within the last three weeks.

Rohr told Dr. Mahal that during a panic attack, he struggled to catch his breath for hours, felt panicked, and experienced chest tightness and light-headedness. Rohr thought that his return to work could be triggering his panic attacks. Dr. Mahal noted in Rohr's medical records that his panic attacks had worsened over the last few weeks.

Rohr also reported that his general anxiety and intermittent explosive anger had also worsened over the last few weeks. Dr. Mahal believed these conditions were worsening and noted this prognosis in Rohr's medical records.

To be diagnosed with intermittent explosive anger, at least once every two to three months, an individual must experience explosive episodes of anger or rage such as yelling, verbal aggression or destruction of property that are out of proportion to the

13

stimulus. Rohr and his wife reported to Dr. Mahal instances where he would become very angry and explosive over small matters.

Rohr also asked Dr. Mahal about writing him a prescription for Xanax, as he had taken it in the past, while flying and found it to be helpful for his anxiety. In addition to his prescription for Buspar, Dr. Mahal wrote Rohr a prescription for Xanax, as needed to treat his "severe and frequent" anxiety attacks. Dr. Mahal was concerned that Rohr's panic attacks were affecting his ability to function.

Xanax is a benzodiazepine and is on Union Pacific's Restricted Prescription Drugs list.

Dr. Mahal has a general understanding that an engineer "operate[s] a train, [and] would be responsible for making sure the tracks were clear while the train was in operation," but is not familiar with the specific duties of Rohr's Locomotive Engineer position. Dr. Mahal did not feel that Xanax would interfere with Rohr's ability to do his job. For prescribed controlled substances to be lawful under FRA regulations, the treating medical practitioner must have made a good-faith judgment, "with notice of the employee's assigned duties and on the basis of the available medical history, that use of the substance by the employee at the prescribed or authorized dosage level is consistent with the safe performance on the employee's duties."

The next day, April 11, 2017, Rohr had an appointment at the Wheatland Clinic with Dr. Imad Nassif, a gastroenterologist. Rohr complained of feeling like he was having a heart attack and reported that he was having a lot of anxiety. Rohr reported

14

that he was taking four Norco a day. Dr. Nassif refilled Rohr's 120-tablet Norco prescription.

Later the same day, Rohr was admitted to the emergency room at Wesley Medical Center for abdominal pain. Rohr reported nausea and blood in his vomit. The emergency room physicians believed Rohr was having a pancreatitis flare-up.

To manage his pain, Rohr received a shot of .5 milligrams of Hydromorphone, a long-acting opiate. Hydromorphone is on Union Pacific's Restricted Prescription Drugs list.

A few weeks later, on April 24, 2017, Rohr contacted Patricia Ringer, a Nurse Practitioner, at the Wheatland Clinic to get his Norco prescription refilled even though he had more than two weeks supply left. Rohr stated he needed the prescription refilled sooner because he was going out of town for work. Rohr had just filled a 120 tablet Norco prescription on April 11, 2017.

**2017 Leave of Absence**

On May 2, 2017, Rohr contacted EAP and reported that he was having issues with anxiety and depression. Rohr stated that he did not feel safe operating a train because of his anxiety and inability to concentrate at work. Rohr requested a leave of absence dated back to April 29, 2017. Rohr's request was granted retroactively and effective as of April 29, 2017.

On May 3, 2017, Union Pacific's Health and Medical Services (HMS) Department sent Rohr a letter granting his request for time off due to a medical condition for April 29, 2017 to May 29, 2017. The letter also stated that in accordance with Union Pacific's Medical Rules, Rohr would be required to undergo a fitness-for-duty evaluation prior to returning to work. The evaluation involved a review of his medical information related to his leave of absence.

On May 10, 2017, Rohr's wife accompanied him to a medication check-in with Dr. Mahal at Prairie View Hospital. Rohr reported that things were "terrible," that he was struggling to catch his breath every day as a result of his anxiety and felt like a "zombie." His wife expressed concern about his mental state as he was making comments about wanting to commit suicide and wanting to hurt his mother-in-law. In fact, Rohr had made a comment about carrying out a murder-suicide.

Rohr told Dr. Mahal that his life may never get better and the only thing keeping him from "destroying his life or harming other people that [he] perceives to be meddlesome" was his children. Rohr made other suicidal statements such as what's "the fucking point" of living and repeatedly suggested that his family would be better off without him.

Rohr's wife told Dr. Mahal that Rohr took 21 Xanax tablets in nine days in addition to his pain medication. The maximum of dosage of Xanax that Rohr could have taken in a nine day period was nine tablets, or put another way, one tablet per day.

Dr. Mahal was so concerned about Rohr's mental health and physical safety as well as the safety of others that she insisted he be hospitalized for in-patient care. Later that day, Rohr was admitted to an in-patient program at Prairie View Hospital for anxiety, depression, suicidal ideation and homicidal ideation.

During the intake process, Rohr's wife expressed serious concerns about his mental health because Rohr was making comments about killing himself and his mother-in-law. His wife believed Rohr was still processing the trauma of witnessing two suicides while working on trains for Union Pacific. He was stoic when he talked about the incidents and used phrases such as "the first time the guy was rolled up like sushi under my train" and "[t]he second time I accidentally stepped in the guy's brains."

Rohr's wife feared that the required travel and isolation of living in hotels and away from home had caused Rohr's mental state to deteriorate further. Finally, Rohr's wife also shared that he was experiencing additional stress and anxiety because the family was living paycheck-to-paycheck despite Rohr's return to work in January 2017. Finally, his wife shared that Rohr's mood quickly shifted from "happy to irritable and there is no clear reason for the shift."

During the intake process, Rohr reported having suicidal and homicidal ideations as well as anxiety. Rohr also reported that the homicidal ideation had started during the past six to eight months, but he had learned to conceal his mental health

17

struggles from others. Rohr believed that his job and ongoing medical issues had exacerbated his anxiety.

Also during intake, Rohr reported that he preferred marijuana to manage his pain and anxiety. Rohr reported that he had used marijuana when he visited his sister in Colorado in April 2017. Rohr took two marijuana tablets a day over a four-day period while in Colorado in April 2017.

While at Prairie View Hospital, Rohr was diagnosed with major depressive disorder, generalized anxiety, generalized panic disorder, and intermittent explosive disorder. In addition to taking BuSpar and Lamictal, Rohr was prescribed Saphris, an antipsychotic medication.

On May 16, 2017, Rohr was discharged from Prairie View's inpatient program, but was voluntarily admitted to the hospital's intensive, outpatient program from May 18 to May 22, 2017, where he attended group therapy, art therapy, recreational programming, medication management sessions, and received other mental health services. Rohr also continued to see Dr. Mahal and Unruh-Revel for medication management and individual therapy.

On May 25, 2017, Rohr had a medication check-in with Dr. Mahal. Rohr reported that he was "a mixed bag" since leaving Prairie View's partial day program. Rohr was no longer having homicidal ideations, and his suicidal ideations had improved. While other symptoms relating to his irritability had improved, Rohr stated he was "not out of the woods yet." Rohr was still experiencing depression and feelings of worthlessness.

18

The medical records and Dr. Mahal's testimony indicate that Rohr started to take Benadryl to help with the dystonia, a side effect of Saphris, although Rohr stated he was concerned that taking Benadryl would affect his ability to operate a train. Rohr denies in an affidavit being concerned about the effect of Benadryl.

On May 26, 2017, Dr. Mahal faxed Union Pacific a letter asking to excuse Rohr from work between the dates of May 10, 2017 and May 22, 2017 due to his hospitalization and the decompensation in his medical status. Dr. Mahal stated that Rohr was still ill, she was managing his medications, and that he was seeing his therapist, Unruh-Revel, on a weekly basis. Dr. Mahal anticipated that Rohr would to return to work by June 19, 2017.

Dr. Mahal faxed the letter to Union Pacific at Rohr's request. Dr. Mahal did not think Rohr could return to work because he was still feeling side effects from various medications.

To return to work, Dr. Mahal believed Rohr would have had to achieve "continued resolution of suicidal and homicidal thoughts, tolerability of medications, and depressive anxiety and other associated symptoms" stabilized "so that he could perform activities of daily living without difficulty."

On May 30, 2017, Rohr had a medication check-in with Dr. Mahal at Prairie View. Rohr reported that he was having "some weird moments" with his memory and had felt more "panicked" and "irritable." Rohr also reported that he had recently told a friend that the stress of his job at the railroad was taking a toll on him and that he hated

his job. Remembering all of the dead bodies and injuries he had seen over the years had affected his mood. He also questioned whether he could even perform his job duties as an Engineer given his ongoing mental health struggles and chronic pain caused by pancreatitis. Rohr described his mindset as being "in the midst of a crisis." He was considering other employment opportunities outside of the railroad. Dr. Mahal noted that Rohr's anxiety seemed to be worsening and that he was showing signs of depersonalization for the first time.

Rohr states in his affidavit that he does not, in fact, hate his job.

On May 31, 2017, HMS sent Rohr a letter granting his request for time off from April 29, 2017 to June 29, 2017, due to a medical condition. The letter also stated that in accordance with Union Pacific's Medical Rules, he would be required to undergo a fitness-for-duty evaluation prior to returning to work. The evaluation would involve a review of medical information related to his leave of absence.

On June 6, 2017, Rohr had an individual therapy appointment with Unruh-Revel. During the session, Rohr shared that he was going back to work at the end of the month. Rohr shared graphic stories of witnessing two different suicides while working on the trains. After the first incident, Rohr felt "jumpy on a train." Unruh-Revel documented that Rohr's management of his anger and frustration with his family members would be hampered by his return to work at the end of the month.

On June 14, 2017, Rohr had a medication check-in with Dr. Mahal. Rohr reported he "[had] been feeling more irritable" and "had increased issues with thinking,

concentration and attention." He also reported that he had "brief moments where he had flashes of suicidal thoughts."

Based on Rohr's comments, Dr. Mahal added the diagnosis of post-traumatic stress disorder (PTSD) to Rohr's medical records as he reported, "history of avoidance, reliving and hyper-vigilant symptoms related to witnessed trauma at work."

On June 14, 2017, Dr. Mahal faxed Union Pacific a letter asking it to extend Rohr's medical leave of absence because he was being evaluated for a new diagnosis and had experienced side effects from the medications that necessitated a visit to the emergency room. Dr. Mahal anticipated that Rohr's new return to work date would be July 1, 2017.

On June 15, 2017, Union Pacific sent Rohr a letter granting his request for an extension.

On June 20, 2017, Rohr had an appointment with Ringer at the Wheatland Clinic for a follow up appointment, after being admitted to the emergency room the night before due to chest pain and light-headedness. Rohr told Ringer it was getting harder to get through the day without any pain medication, and he was afraid that he might lose his job because he was dependent on the pain medication. Rohr shared that he was looking into going on disability. Ringer documented in Rohr's medical records that he continued to have chronic pancreatic pain, some chest pain, and multiple psychiatric issues, specifically, depression and anxiety.

On June 28, 2017, Rohr had a medication check-in with Dr. Mahal. Rohr reported that he was having difficulty sleeping and would wake up gasping for air. Rohr believed the difficulties resulted from all of the medications he was taking. To help him sleep, Rohr started to take ZzzQuil and Melatonin. Rohr also reported that he was having some mild panic attacks "attached to nothing in particular." He also still had some feelings of "hopelessness and helplessness." Rohr was still worried about "being able to physically complete the job."

In Rohr's medical records, Dr. Mahal noted that his work for Union Pacific seemed to worsen his PTSD and that Rohr's medications were not stabilized. She did not think he was ready to return to work. Later that day, Dr. Mahal faxed Union Pacific a letter asking it to extend Rohr's medical leave of absence again, because she was still evaluating him for a new diagnosis and he was dealing with the side effects of new medications. Dr. Mahal anticipated that Rohr's new return to work date would be July 22, 2019.

On July 9, 2017, Rohr was admitted to the emergency room at Wesley Medical Center due to acute and progressive epigastric abdominal pain. Rohr reported the pain was consistent with previous pancreatitis pain. To relieve the pain, Rohr was given a shot of Hydromorphone, a long-acting opioid. He also received a prescription for Percocet 7.5 #12, a short-acting opioid.

On July 10, 2017, Rohr had a medication check-in with Ringer at the Wheatland Clinic. Rohr said he did not fill the Percocet prescription that he received in the

22

emergency room the night before. Ringer refilled Rohr's Norco prescription and gave him a new prescription for Percocet #30 to help prevent emergency room visits.

On July 18, 2017, Rohr had a medication check-in with Dr. Mahal. Rohr reported that he was "not sure about going back to work." He continued to "feel depressed," "hopeless at times," and "zapped of energy." His "memory and concentration [had] been poor." While he denied suicidal and homicidal ideations, he had experienced "some brief and morbid thoughts," but "was able to thwart it from growing." Rohr was also experiencing panic attacks and "intrusive thoughts about previous bad memories from work-related issues."

Because of Rohr's concerning statements about morbid thoughts and worsening depression, Dr. Mahal had Rohr agree to a safety contract and a crisis plan. Rohr also agreed not to have any firearms in his home. In his medical records, Dr. Mahal noted that Rohr's major depressive disorder was unstable and possibly worsening.

This medication check-in would be the last time Dr. Mahal saw Rohr, due to her impending maternity leave and Rohr's eventual discharge from Prairie View's psychiatric program for non-responsiveness. At that time, Dr. Mahal did not think Rohr was stable enough to return to work.

Dr. Mahal has testified she wasn't familiar with Rohr's job as a Locomotive Engineer. She has no knowledge of the purpose or essential functions of the position, and no experience in the railroad industry. While Dr. Mahal assumed Rohr was working in a safety-sensitive position, she did not know what safety-sensitive means

according to Union Pacific. She testified that, when preparing the various updates on Rohr's behalf for Union Pacific, she didn't assess whether Rohr could safely perform his job.

She testified that, be cause she was going on maternity leave, she was relying on Carolyn Kliewer, a physician assistant, to use her clinical judgment to assess whether Rohr would actually be able to return to work on July 22, 2017. Based on her direct evaluation of Rohr on July 18, Dr. Mahal believed he could not return to work in light of his unstable, and possible worsening, depressive disorder.

According to Dr. Mahal, because Rohr's conditions were not resolving, there was a risk that they could be exacerbated in ways that weren't predictable or preventable. There were no guarantees that Rohr wouldn't experience episodes of blind rage or other manifestations of explosive anger. There were also no guarantees that Rohr wouldn't experience either suicidal or homicidal ideations in the future.

On July 26, 2017, Union Pacific sent Rohr a letter stating that HMS had received Rohr's request to extend his medical leave of absence until September 29, 2017. The letter also stated that in accordance with Union Pacific's Medical Rules, Rohr would be required to undergo a fitness-for-duty evaluation prior to his return to work. The evaluation would include a review of medical information related to his absence.

On August 2, 2017, Union Pacific wrote Rohr that his medical leave of absence would extend until September 27, 2017. The letter also stated that if Rohr was unable to

return on July 29 2017, he must submit medical documentation that supported his continued absence.

On August 4, 2017, Rohr had an appointment with Ringer at Wheatland Clinic to discuss his pain medication. Rohr complained that his Norco prescription was no longer working and claimed he needed a stronger prescription. Ringer wrote Rohr prescriptions for Dilaudid, a long-acting opioid completely prohibited by Union Pacific, and Percocet to prevent visits to the emergency room. Ringer also wrote Rohr a note allowing him to return to work with restrictions of light duty and no lifting over 20 pounds.

Rohr has testified that his job as an Engineer was not a light duty job and that there were circumstances in which he had to be able to lift more than 20 pounds.

On August 6, 2017, Rohr was admitted to the emergency room at Wesley Medical Center for re-evaluation of possible pancreatitis. Rohr reported that he had previously been told "he [had] a final liver." Rohr had elevated liver enzymes "likely consistent with [his] fatty liver."

The emergency room physician warned Rohr that his elevated liver enzymes "correlate with excessive intake of Tylenol." The physician administered two shots of Hydromorphone, a long-acting opiate completely prohibited by Union Pacific, to ease the pain.

On August 18, 2017, Rohr had a medication check-in with Carolyn Kliewer, a Physician's Assistant, at Prairie View. Rohr expressed concern that he could not follow

Union Pacific's Restricted Prescription Drugs policy because he was completely dependent on opioid narcotics and would likely need to take them within 12 hours of a shift, which were unpredictable. Rohr also disclosed that he had made peace with the need to find a new job.[2] The plan from the visit was for Rohr to schedule another appointment in two months, but this was the last time he went to Prairie View and he was given an unplanned discharge from treatment for going six months with no contact.

On August 29, 2017, Rohr had an appointment with Ringer at the Heartland Clinic in Wichita, Kansas to discuss his pain medication prescriptions. Rohr complained that Dilaudid and Percocet were no longer working and "barely took the edge off." Rohr stated that he was "open to trying something a bit a stronger." Ringer wrote Rohr a prescription for Oxycodone Hydrochloride, a long-acting, extended-release opioid completely prohibited by Union Pacific.

On September 14, 2017, Rohr had a mediation check-in with Dr. Zafar at Clifton Family Medicine, previously known as Wheatland Clinic. Rohr reported that he would be returning to work soon. He was still taking Oxycodone Hydrochloride, a long-acting, extended-release opioid, and each tablet lasted about four hours. He was not sure how he felt about the medication. Dr. Zafar refilled Rohr's prescription for Oxycodone and increased the amount to 180 tablets for 30 days.

---

[2] Rohr states in his Response that during this conversation, he meant only that he was intending to bid on other, scheduled jobs at Union Pacific, although there is no evidence of his actually discussing or bidding on any such positions with Union Pacific.

**The Fitness Evaluation**

The purpose of Union Pacific's medical fitness-for-duty (FFD) evaluation is to determine if an individual is qualified to safely perform his or her job. Union Pacific conducts an FFD evaluation when there are legitimate concerns over an employee's ability to safely perform the essential functions of his or her job. The FFD focuses on the safety risks in the railroad environment associated with the employee's specific health condition and job duties. Union Pacific conducts an individualized analysis of whether the employee's condition impacts his or her ability to perform the job by reviewing medical records relevant to the specific medical condition in question and, in some cases, arranging for independent medical specialists to evaluate the employee's records and condition.

As part of the fitness-for-duty evaluation, HMS asked for copies of Rohr's medical records, and Rohr submitted the records relating to his May 2017 psychiatric hospitalization and outpatient treatment with Prairie View.

Union Pacific's Associate Medical Director, Dr. John Charbonneau, a board-certified Occupational Medicine physician with over 40 years of experience, reviewed the medical records and worked with EAP to evaluate Rohr's case and his treatment. According to Dr. Charbonneau, it was immediately apparent Rohr had some "serious mental problems" with diagnoses for major depressive disorder, generalized anxiety, intermittent explosive disorder, PTSD, suicidal ideation, and homicidal ideation.

After reviewing the Prairie View records, Dr. Charbonneau was concerned that Rohr had some very serious and severe mental-health problems. Rohr had been hospitalized for severe suicidal and homicidal ideation and severe depression and anxiety. He then underwent "partial" hospitalization and then was being treated on an outpatient basis at Prairie View. His most recent psychiatry note from July 18, 2017, raised serious concerns about Rohr's readiness to return to work. Rohr was hypersomnolent and depressed. The note stated: "Patient reports his concentration and memory have been poor." The note also mentioned: "Patient denies any suicidal ideation, intent or plan at this time. He did have some brief morbid thoughts a few days ago but 'was able to thwart it from growing.' Contracts for safety and agrees to crisis plan. No firearms at home." Rohr's diagnoses included, Major Depressive Disorder, Generalized Anxiety Disorder, Panic Disorder, Post-Traumatic Stress Disorder, and Intermittent Explosive Disorder. All but the last diagnosis were considered to be "unstable or worsening."

Dr. Charbonneau reviewed the case with Dr. John Holland, Chief Medical Officer for Union Pacific, a board-certified physician in Occupational Medicine with over 40 years of experience. Drs. Holland and Charbonneau discussed Rohr's medical conditions including that Rohr had recently been hospitalized for severe depression with suicidal and homicidal ideation. They also discussed that Rohr was receiving ongoing treatment by mental health providers for multiple severe and chronic psychiatric conditions including major depressive disorder, generalized anxiety

disorder, panic disorder, post-traumatic stress disorder, and intermittent explosive disorder and that Rohr was on multiple psychoactive medications for his psychiatric conditions which is reflective of the severity of his conditions.

After discussing Rohr's case, they agreed to have Dr. Terry Davis, a board certified forensic psychiatrist with over 30 years of psychiatric experience, review Rohr's medical records. Union Pacific sent Dr. Davis copies of the Locomotive Engineer job description and Rohr's records from Prairie View.

When assessing complex, severe or nuanced diagnoses, HMS often consulted independent experts to get a detailed assessment of an employee's health outlook—current and future—to determine whether that employee could safely return to work and whether restrictions were appropriate. Additionally, consulting an independent expert ensures that HMS is reviewing all of the information available and conducting a "good and fair" assessment of an individual's outlook.

During a conference call with Dr. Holland, Dr. Davis affirmed Rohr's psychiatric diagnoses for recurrent and moderate major depressive disorder; panic disorder; intermittent explosive disorder; moderate and recurrent generalized anxiety disorder, and PTSD. Dr. Davis also opined that the likelihood of Rohr having future serious exacerbations of his mental disorders was high and that such exacerbations were likely to manifest themselves with symptoms similar to those he had experienced in the past. The exacerbations would be unpredictable and unpreventable, even with continued and intensive psychiatric treatment. Dr. Davis concluded Rohr's exacerbations would

present a serious and unacceptable risk of harm to himself and others, and no accommodation could reduce that potential harm. Dr. Davis concluded that Rohr could not return to work at Union Pacific in any job.

Dr. Holland agreed with Dr. Davis's independent, individualized assessment and on September 12, 2017, issued a determination that medically disqualified Rohr from working at Union Pacific. In the determination, Dr. Holland reviewed Rohr's medical record and history noting Rohr's psychiatric hospitalization and diagnoses posed significant risks at work for Rohr and others. He noted Dr. Davis's findings that Rohr had a Major Depressive Disorder as "most [likely] a lifelong condition that was likely to recur periodically even if he received optimal psychiatric treatment," that (given his condition) Rohr would be unlikely to seek the necessary treatment, and that (given his homicidal and suicidal ideations) he would be a threat to himself and others in any safety-critical position, and a threat to others in any position. Dr. Holland concluded that Rohr had "multiple serious and recurrent conditions, specifically, major depressive disorder, with suicidal and homicidal ideation, that pose significant, imminent, unacceptable safety risks for him and others [if] he were to work in any safety critical or non-safety critical job for UPRR." For these reasons, Rohr was given a general medical disqualification from doing any job at Union Pacific.

On September 12, 2017, Dr. Holland notified Rohr of the decision via a telephone call. In his deposition, Rohr stated that while he concerned about the loss of income, this

information was not a shock — and that in fact he was relieved by the decision and felt that he could move on with his life and pursue other employment opportunities.

Two days later, Union Pacific sent Rohr a letter stating that he had been permanently disqualified from working in any position at Union Pacific. As a result, Union Pacific terminated Rohr's employment.

On December 4, 2017, Dr. Davis submitted a written psychiatric opinion report concerning Rohr to HMS, which was consistent with the conclusions and recommendations he discussed during the telephone conversation with Dr. Holland as memorialized in Dr. Holland's fitness-for-duty memo. Dr. Davis specifically concluded:

a. Rohr had experienced ongoing problems with depression and anxiety, including having thoughts of suicide for most of his life starting at around 10 years old;

b. Rohr's mental disorders were chronic and would continue into the future despite appropriate treatment with both psychotropic medications and psychotherapy, and it was likely that he would have periodic exacerbations of his mental disorders in the future;

c. exacerbations of Rohr's mental disorders and the reoccurrence of his symptoms were likely to be unpredictable in terms of onset, duration and severity;

d. the signs and symptoms of Rohr's metal disorders were likely to be gradual and insidious in terms of onset and would be difficult for either Rohr or others to perceive, making it difficult or impossible to reliably predict and prevent a deterioration of his mental condition and a full-blown exacerbation of his mental disorders;

e. Rohr's medical records clearly and repeatedly documented that the stress of his job at Union Pacific continued and significantly impaired his ability to function in a work setting;

f. that the symptoms of Rohr's mental disorders seriously impaired his ability to perform in a safe manner his job as a Locomotive Engineer, any safety-critical job, and potentially any job at Union Pacific;

31

g.  Rohr's difficulties with thinking, concentrating, and making decisions, poor energy, becoming easily fatigued, feeling lightheaded or dizzy, feeling faint, and his mind going blank, coupled with his of suicidal and homicidal ideation, posed a significant, imminent, and unacceptable safety risk and created a substantial risk of serious harm to himself, co-workers, and the public, if he were to work in any safety-critical job at Union Pacific, or really any job at Union Pacific; and

h.  there was no accommodation that would reduce that risk of harm and allow Rohr to return to work at Union Pacific in any job.

On January 5, 2020, Dr. Davis submitted his expert report in this matter. In addition to the findings and conclusions stated in his psychiatric opinion concerning Rohr, Dr. Davis concluded that Rohr's mental health conditions were further complicated by his serious medical conditions. Rohr's pancreatitis had been documented in his records as causing severe pain and necessitating frequent visits to the emergency room. Such a chronic condition was likely to be disabling on its own, but it also increased the likelihood that he Rohr would experience a worsening of his depression and anxiety during episodes of physical illness.

Dr. Davis concluded that Rohr's long-term treatment with opioid medications and his use of marijuana were seriously concerning in terms of his ability to perform his job duties in a safe manner. Opioid medications are central nervous system depressants and were likely to worsen further his difficulty thinking, concentrating, and making decisions; his energy level and fatigue; and his feelings of dizziness and feeling faint.

Dr. Davis concluded that Rohr posed a direct and ongoing safety risk of serious and substantial harm to himself, co-workers, and the public if he would be allowed to work at his job as a Locomotive Engineer, work in any safety-critical job for Union

Pacific, or really work at any job for Union Pacific. Dr. Davis thought Rohr should be considered unfit for duty, and that Dr. Holland's determination of a general medical disqualification was reasonable and appropriate.

**Subsequent Events**

On April 30, 2018, Rohr filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission and the Kansas Human Rights Commission, alleging that he had experienced a number of life stressors that caused him to take a medical leave of absence in October 2016 and April 2017, and that when he tried to return to work Union Pacific obtained and "combed through" his medical records. Rohr was medically disqualified due to a "psychiatric condition" that prevented him from holding any meaningful job at Union Pacific.

On February 20, 2019, the EEOC sent Rohr a right to-sue-letter notifying him that it had closed the file on his charge of discrimination because it was unable to conclude that the information obtained established violations of any statutes.

After Union Pacific terminated his employment in September 2017, Rohr started working part-time as a clerk for $9.00 per hour at K&S Liquor in Derby, Kansas in November 2017. He did not apply to any other jobs before he was hired at K&S Liquor, and worked at K&S Liquor until May 2018 when he decided to stay home to care for his kids. Beyond caring for his children, Rohr has not looked for employment since May 2018.

33

Rohr has no plans to look for employment in the future, and has not earned any income since he left his position at K&S Liquor.

He has testified that he has had panic attacks "off and on even to this day," and had one emergency room visit for a panic attack after leaving Union Pacific.

In his deposition, Rohr admits that he was addicted to opioids through late 2016, all of 2017 and part of 2018.

Rohr was in violation of the Union Pacific Railroad controlled substances policy, during 2016 and 2017. Despite having familiarity with Union Pacific's Restricted Prescription Drugs list as early as February 2016 when Rohr was prescribed Tramadol, he continued to take and request long-acting and short-acting opiates that were restricted and prevented him from safely performing his job.

On December 7, 2017, Rohr had a check-in with Ringer at ICT Medicine and Pain Management in Wichita, Kansas. She started Rohr on Oxycontin 10 mg pills for his chronic pain. He was also still taking Norco and Oxycodone to help manage his pain. Rohr's compliance urine sample tested positive for THC. Ringer informed Rohr that he could not mix THC and pain medications.

Rohr's urine samples tested positive for THC from January 5, 2018, to June 7, 2018, despite being counseled multiples times not to mix THC with pain medications. Rohr admitted that he was smoking marijuana to manage his pain.

On May 1, 2018, Rohr was rushed to Via Christi Medical Center in Wichita, Kansas, via ambulance for abdominal pain, intractable vomiting, and suspected opioid withdrawal.

Rohr responds to Union Pacific's motion by denying he ever actually operated a train while under the influence of a pain medication. He states he is not currently taking any medication on the railroad's list, and further states that his suicidal *ideations* never progress to any actual *planning*. He contends that in some instances where the evidence shows he was using marijuana, he was actually taking CBD tablets. He repeatedly argues that Union Pacific failed to conduct an individualized assessment which would establish that he is a direct threat to others, and that Union Pacific cannot lawfully issue a blanket restriction on employee medications without a particularized inquiry.

**Conclusions of Law**

In its summary judgment motion against Rohr's ADA discrimination claim, Union Pacific argues that the evidence fails to show that Rohr was a qualified individual, or that it acted with any discriminatory intent in terminating his employments. More specifically, it specifically, it argues that the FTD determination is not any direct evidence of disability discrimination, and argues that the plaintiff has failed to show a prima facie case of discrimination, because he has failed to show that he was qualified for his position as a Locomotive Engineer because of his illegal drug use and prescription opioid abuse; he couldn't perform the essential functions of his job

35

due to the light duty and 20-pound lifting restriction, and because he was could not safely work the position at the time his employment was terminated

The court concludes that summary judgment is appropriate because, in light of his major depressive disorder, his chronic ideations of homicide and suicide, and his admitted chronic addition to medications prohibited by the railroad's rules, the plaintiff was otherwise not qualified for safe employment in his position as a Locomotive Engineer. A person may not be qualified for a position "where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others." *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (internal quotation and citations omitted). "In evaluating an employer's direct-threat contention, the fact-finder does not independently assess whether it believes that the employee posed a direct threat. [Rather], the fact-finder's role is to determine whether the employer's decision was objectively reasonable." *Id.*

The plaintiff relies in particular on the recent decision by the Fifth Circuit observed in *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342 (5th Cir. 2019). However, this court has recently found *Nall* distinguishable in a similar case. *See Krehbiel v. Union Pac. Rd.*, No. 19-2002-JAR, 2020 WL 5503363, at * 10 (Krehbiel v. Union Pac. R.R. Co., No. 19-2002-JAR, 2020 WL 5503363, at *10 (D. Kan. Sept. 11, 2020), noting, among other things that the plaintiff's treating physician (like Dr. Mahal) "had no knowledge of Plaintiff's

specific job duties," and (as here) there is psychiatric evidence supporting Dr. Holland's conclusions.

Here, the evidence establishes that Union Pacific relied on the most current medical knowledge and the best available objective evidence, and upon an expressly individualized assessment of the Rohr's present ability to safely perform the essential functions of the job of Locomotive Engineer.

The plaintiff cites a recent Texas decision in which the court denied summary judgment where the employer terminated a conductor based on a concern of a potential suicide, *West v. Union Pac. R.R. Co.*, No. 4:18-CV-3340, 2020 WL 1446908, at *1 (S.D. Tex. Mar. 24, 2020), as well as two cases involving police officers. *See McKenzie v. Dovala*, 242 F.3d 967 (10th Cir. 2001); *Stokes v. City of Montgomery*, No. 2:07-cv-00686, 2008 WL 4369247 (M.D. Ala. Sep. 25, 2008).

The court finds that *West* is distinguishable.[3] In that case, the defendant terminated the employee following a single incident of attempted suicide on the day after Christmas. Afterwards, there was evidence that the employee was successfully managing his condition. His treating psychiatrist reported that his "prognosis was 'fair to good,' assuming compliance with his treatment regimen, and that his condition on discharge was "[*s*]*table, improved, not psychotic, not suicidal, not homicidal*." 2020 WL 1446908, at *2 (S.D. Tex. Mar. 24, 2020) (emphasis added). After being discharged, the

_____

[3] Judge Robison distinguished *West* in *Krehbiel* for the same reasons cited above. 2020 WL 5503363, at *10.

treating psychiatrist saw the employee on a monthly basis, and he attended group therapy until he decided that he "didn't need it." After litigation began, the employee's treating psychiatrist specifically disagreed with the conclusion of the railroad's reviewing authority as to any danger posed by the employee.

Here, by contrast, Rohr's suicidal (and homicidal) ideations were chronic. These patterns persistent throughout 2006 and 2007. Dr. Mahal never concluded that it was safe for Rohr to return to work, she delegated that assessment to a non-physician assistant. Dr. Mahal has candidly admitted she has no knowledge of the detailed requirements of the position of Locomotive Engineer, and has not directly disputed the opinions of Dr. Davis and Dr. Holland. These doctors, the only medical source testimony with knowledge of the requirements of the Locomotive Engineer position, have concluded that Rohr's employment was unacceptably dangerous.[4]

The role of the court is not to second-guess these authorities, but to determine whether their conclusions were objectively reasonable, based on current medical knowledge and the best available objective evidence. Dr. Davis and Dr. West made their determination based on their assessment of the plaintiff's individual medical history —

---

[4] The other cases cited by plaintiff are also distinguishable. In *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086, 1091-92 (10th Cir. 2008) the employee electrician had suffered a stroke but there was evidence that the impact was minor and he could still perform his work with slight modifications. The two police cases are also unhelpful. In one, the employer never argued the existence of an unavoidable direct threat to safety, *McKenzie*, 242 F.3d at 974, and in the other the court expressly agreed with the plaintiff that "rejected the medical opinions offered to them that Stokes was qualified to work without restrictions [and] Defendants have offered no objective evidence" to the contrary. *Stokes*, 2008 WL 4369248, at *8.

one which showed long-standing depression and repeated ideations of suicide and homicide. Unlike *West*, there is no evidence that Rohr's treating physician believed he was getting better, no evidence she believed he could do the specific tasks of his job, and no evidence that Rohr himself believed he was getting better. He was in fact relieved when told he was not accepted for a return to work.

The court finds that Rohr has failed to show there are questions of fact as to the objective reasonableness of Union Pacific's determination that the plaintiff was a direct threat. Accordingly, he cannot demonstrate that he was a qualified individual and fails to establish a *prima facie* case of disability discrimination.

In light of this determination, the court need not resolve the other issues raised by Union Pacific's motion, such as whether the plaintiff failed to mitigate his damages, whether the plaintiff otherwise unqualified for his position in light of his drug additions and violation of Union Pacific's rules regarding medications, or whether (even assuming Rohr established a *prima facie* case) Union Pacific had a legitimate, non-discriminatory and non-pretextual reason for terminating plaintiff's employment.

IT IS ACCORDINGLY ORDERED this day of September, 2020, that the defendant's Motion for Summary Judgment (Dkt. 40) is hereby granted.


*J. Thomas Marten*
J. Thomas Marten, Judge

39